IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA § | |
| § | |
| v. § | No. 1:17-CR-00151 |
| § | (Judge Marcia Crone) |
| MOHAMED IBRAHIM AHMED § | |
| a.k.a. "Talha", "Mohammed El Eritri", § | |
| "Abu Zakaria" § | |

## SENTENCING MEMORANDUM

### I. Statement of the Case

This case is set for sentencing on August 7, 2020, at 2:00 p.m. The defendant, Mohamed Ibrahim Ahmed, (defendant), was tried on an Indictment charging violations of 18 U.S.C. § 2339B (attempting to provide material support to a foreign terrorist organization), 18 U.S.C. § 1001 (making false material statements), and 18 U.S.C. § 373 (soliciting a crime of violence). The jury found the defendant guilty of attempting to provide material support to a foreign terrorist organization (count 1) and one count of making false material statements (count 3), not guilty of one count of making false material statements (count 4) and soliciting a crime of violence (count 5), and was unable to reach a verdict on one count of making false material statements (count 2). The government is requesting a Guidelines sentence of 300 months and a lifetime term of supervised release.

### II. Statement of Facts

In 2012, in the Southern District of New York (SDNY), the defendant pled guilty to conspiring to provide material support to al-Shabaab and conspiring to receive military type training from that organization. (See Exhibit A, 22:16-22) (admitted at trial as Exhibit 5). The defendant admitted to agreeing with others to donate 2000 Euros to al-Shabaab, and he admitted

he knew the United States considered al-Shabaab to be a terrorist organization. (Ex. A, 21:5-9). The defendant also admitted he agreed with others to join an al-Shabaab military training camp. (Ex. A, 21:10-17). The defendant was sentenced to 111 months and ultimately designated to the Beaumont Federal Correctional Institute (FCI). (See Exhibit B, p. 3) (admitted at trial as Exhibit 4).

While at FCI, the defendant attempted to recruit and prepare other inmates to join a designated foreign terrorist organization, specifically ISIS. As part of his recruiting effort, the defendant distributed a draft translation of an asymmetric warfare manual to Inmate 1 and Inmate 2. (See Exhibit C) (admitted at trial as Exhibit 1). The defendant told the inmates to study the manual and keep it hidden. (Inmate 1 Tr. 37:3-10, ECF Doc. No. 192) (Inmate 2 Tr. 14:1-13, ECF Doc. No. 191). The manual provides operational and logistical guidance on using guerilla or asymmetric warfare to defeat a superior force and control and maintain territory for the purpose of creating an Islamic state under Sharia law. (Ex. C, p. 5 & 9). The manual justifies and celebrates acts of terrorism and describes offensive jihad as a religious requirement. (Ex. C, p. 4, 11, 14, & 31). The manual also provides instruction on selecting human targets and declares "We must target and kill the Jews and Christians." (Ex. C, pp. 31-32).

The defendant distributed the manual not only to recruit Inmate 1 and Inmate 2 to his cause, but also to psychologically prepare the inmates to engage in violence, as evidenced by the defendant's discussions about killing the "kuffar" (non-believers) with a gun, a knife, with anything they could get their hands on. (Inmate 2 Tr. 24:12-19). The defendant told Inmate 2 if he attacked and killed for the "deen" (religion), he would receive a reward in the afterlife. (Inmate 2 Tr. 25:1-4). The defendant told Inmate 2, "this is what God wants." (Inmate 2 Tr. 25:4-6).

The defendant also directed Inmate 1 through a physical training regimen designed to prepare the inmate to be a "soldier" for ISIS.  (Inmate 1 Tr. 18:2-6).  The defendant instructed Inmate 1 to put weighted medicine balls in a laundry bag and scale the batting cage in the FCI recreation yard to simulate climbing mountains in rugged terrain.  (Inmate 1 Tr. 17-18:16-24).  The defendant wanted Inmate 1 to pledge allegiance to ISIS.  (Inmate 1 Tr. 11-12:24-1).  Inmate 1 was to remain in the United States after he was released from prison, and be a liaison for ISIS within the US.  (Inmate 1 Tr. 16:6-21).

Inmate 2 testified the defendant attempted to prepare Inmate 2's mind for the defendant's ideology "extensively."  (Inmate 2 Tr. 72-73:23-3).  Inmate 2 also testified the defendant had him train physically, in order to prepare to hike mountains, avoid U.S. military forces, and be able "to up and go at the drop of a dime."  (Inmate 2 Tr. 73:10-19).  The training was to prepare Inmate 2 to be physically fit for jihad.  (Inmate 2 Tr. 75:5-6).

The defendant was attuned to media about terrorist attacks.  (Inmate Tr. 20:2-5).  The defendant was "very happy" about a news report of a man in London who killed pedestrians with a truck.  (Inmate 2 Tr. 21:1-9).  The defendant told Inmate 2 it was a "good idea" to use the Arianna Grande concert to attack "so many young kids."  (Inmate 2 Tr. 21:18-21).  The defendant also told Inmate 2 he was "very happy" about the April 2017 attack in Stockholm, Sweden, when Rakhmat Akilov killed five pedestrians with a truck.  (Inmate 2 Tr. 37:1-5).  The defendant advocated killing disbelievers to prevent people from "going against the religion," and told Inmate 2 jihadists should kill the children of non-believers to prevent them from attacking Muslims.  (Inmate 2 Tr. 41:15-22).

The defendant also revealed his desire to exact revenge on the United States for his prior prosecution by telling Inmate 1 and Inmate 2 about a plan to bomb the detention facility in New

York where he had been held.  The defendant described making an explosive with shrapnel and a chemical called RDX that would be concealed in a briefcase.  (Inmate 1 Tr. 13-14:20-16).  The briefcase would be carried into the detention center and left there, to be detonated remotely.  (Inmate 1 Tr. 14-15:17-5).  The defendant also talked to Inmate 2 about "liquid bombs" that could be concealed inside laptops or other mobile devices and carried onto planes or easily concealed in public.  (Inmate 2 Tr. 28:1-6).

The defendant was interviewed by two Federal Bureau of Investigation Special Agents on October 24, 2017.  The defendant acknowledged the asymmetric warfare manual was part of his discovery from the SDNY case, but denied giving it to any inmates.  (See Exhibit D, 22:20-22 & 27:16-24) (admitted at trial as Exhibit 27A).  The agents also questioned the defendant about plans to bomb the detention center in New York.  (Ex. D, 35:16-17 & 44:14-15).  The defendant denied talking about bombs, and denied having bomb-making knowledge or knowledge about explosive chemicals.  (Ex. D, 35-36:18-8 & 44-45:16-2).[1]

The defendant was indicted on December 6, 2017, for attempting to provide material support to a designated terrorist organization, specifically ISIS, in violation of 18 U.S.C. § 2339B.  The defendant was also charged with 3 counts of making material false statements in the course of a terrorism investigation in violation of 18 U.S.C. § 1001, based on the defendant's denial of discussing the construction of a bomb, denial of having bomb-making knowledge, and denial of having knowledge of bomb-related chemicals.

A superseding indictment was returned against the defendant on July 12, 2018, adding one count of soliciting a crime of violence in violation of 18 U.S.C. § 373.  The original four

---

[1] At trial, the government also presented the testimony of Person A, who testified he and the defendant attended Khalden training camp in Afghanistan in approximately 1996.  Person A testified the training included instruction on explosives.

counts remained as charged in the initial indictment. The defendant filed a motion to represent himself on November 12, 2019, and proceeded to trial with standby counsel on December 2, 2019. (ECF Doc. No. 106).

### III. The Offense and Guideline Calculations

The defendant's first count of conviction is an attempt to violate 18 U.S.C. § 2339B, which prohibits the provision of material support to a designated foreign terrorist organization. The authority to designate an entity a "foreign terrorist organization" rests with the Secretary of State. *Holder v. Humanitarian Law Project*, 561 U.S. 1, 1 (2010). The Secretary may, in consultation with the Secretary of the Treasury and the Attorney General, so designate an organization upon finding that it is foreign, engages in "terrorist activity" or "terrorism," and thereby "threatens the security of United States nationals or the national security of the United States." *Id*. The organization at issue here (i.e. ISIS) has been a designated foreign terrorist organization since 2004. *See* 69 Fed. Reg. 61292 (Sept. 27, 2004).

"Material support or resources" is defined by statute to include:

> [A]ny property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials.

18 U.S.C. §2339A(b)(1).

The defendant was also convicted of violating 18 U.S.C. §1001, which prohibits making false material statements in any matter within the jurisdiction of any department or agency of the

United States. *See United States v. Rodgers*, 466 U.S. 475, 479 (1984). A criminal investigation falls within the meaning of "any matter," and the FBI qualifies as a department or agency of the United States. *See Id.*

The United States Probation Office (USPO) has prepared a PreSentence Report (PSR) that fairly and accurately computes the defendant's guideline calculation. The base offense level for a violation of 18 U.S.C. § 2339B is 26. (PSR, ¶ 23). In this case, a 2 level increase for providing material support or resources intending, knowing, or with reason to believe they would be used to commit a crime of violence is appropriate because the defendant intended to provide "soldiers" to ISIS to engage in fighting. (PSR, ¶ 24). The base offense level is further increased by 12 levels because the offense involved a federal crime of terrorism for an adjusted offense level of 40. (PSR, ¶ 25). The terrorism enhancement also increases the defendant's criminal history category from III to VI. (PSR, ¶ 46).

The terrorism enhancement applies where "the offense is a felony that involved, or was intended to promote, a federal crime of terrorism." U.S.S.G. § 3A1.4(a), *see also United States v. Fidse*, 862 F.3d 516, 521 (5th Cir. 2017). The term "federal crime of terrorism" as used in §3A1.4 "has the meaning given that term in 18 U.S.C. § 2332b(g)(5)." *See* U.S.S.G. § 3A1.4 cmt. n.1. Under § 2332b(g)(5), an offense qualifies as a federal crime of terrorism if two distinct requirements are met: (1) the offense is a violation of one or more enumerated statutory provisions, and (2) the offense "is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." *Fidse,* 862 F.3d at 521.

The Fifth Circuit has recognized that an offense "involved" a federal crime of terrorism when the defendant's offense *includes* a federal crime of terrorism. *Id.* at 522. Providing material support to a foreign terrorist organization as proscribed by 18 U.S.C. § 2339B is one of

6

the enumerated terrorism offenses. *See* 18 U.S.C. § 2332b(g)(5)(B)(i). The terrorism enhancement can be applied to inchoate offenses, such as attempt. *United States v. Wright*, 747 F.3d 399, 407 (6th Cir. 2014). Therefore, the terrorism enhancement applies to count 1 in the instant case if the offense is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct. *See* U.S.S.G. § 3A1.4 cmt. n. 1; *Fidse*, 862 F.3d at 521.

      The government is only required to prove the applicability of U.S.S.G. § 3A1.4 by a preponderance of the evidence. *Fidse*, at 523. The government is not required to prove that the defendant had the means or ability to implement his plans. *See United States v. Mandhai*, 375 F.3d 1243, 1248 (11th Cir. 2004). Rather, "it is the defendant's purpose that is relevant." *Id.* Finally, the terrorism enhancement applies even if the defendant acted with multiple goals simultaneously, so long as at least one of the defendant's purposes was to influence government or retaliate against government conduct. *See United States v. Van Haften*, 881 F.3d 543, 545 (7th Cir. 2018); *see also Wright*, 747 F.3d at 408.

      Providing material support to ISIS, in this case personnel in the form of trained fighters, is clearly an offense calculated to influence or affect the conduct of government by intimidation or coercion. From its very inception, ISIS's purpose has been to affect the conduct of multiple governments through acts of terrorism. *See United States v. Elshinawy*, 2018 WL 1521876, 25 (D. Md. March 28, 2018). The Fifth Circuit has determined that 18 U.S.C. § 2332b(g)(5) "refers broadly to 'government,'" foreign or otherwise. *See United States v. Khan*, 938 F.3d 713, 718 (5th Cir. 2019) (holding district court committed procedural error when it failed to apply terrorism enhancement to conviction for providing material support to ISIS).

7

The trial testimony of Dr. Lorenzo Vidino, Director of the Program on Extremism at George Washington University, established ISIS has engaged in a sustained effort to affect the conduct of multiple governments through violence. Dr. Vidino testified the primary objective of all jihadist groups, including ISIS, is to create a state under Sharia rule. (L.V. Tr. 28:6-20, ECF Doc. No. 185). A core belief of jihadist groups is that Christians and Jews are the enemy that occupy Muslim lands, and it is a religious duty for Muslims to engage in offensive jihad against them. (L.V. Tr. 49:16-21). Jihadist groups also claim Muslim lands are under occupation, whether through the direct presence of American troops or because of governments that are aligned with the West, and it is the duty of Muslims to fight these regimes and replace them with a new social system. (L.V. Tr. 56:8-20). ISIS is the most prominent of the jihadist groups in terms of carrying out the objective to establish a state. (L.V. Tr. 28-29:21-5). In 2011, ISIS exploited the chaos created by the Syrian civil war and began moving fighters into the area around the Iraq/Syria border. (L.V. Tr. 26:10-22). By 2014, ISIS controlled territory the size of France and declared itself the caliphate, or legitimate Islamic State. (L.V. Tr. 27:16-20, 30:7-19).

ISIS's efforts to influence and affect governments through terrorism include the government of the United States. ISIS has been a designated foreign terrorist organization since 2004. *See* 69 Fed.Reg. 61292 (Sept. 27, 2004). The Department of State cannot designate an organization as an FTO unless the organization's activity or terrorism threatens the security of U.S. nationals or the national security (national defense, foreign relations, or the economic interests) of the United States. *See* 8 U.S.C. §§ 1189(a)(1), 1189(d)(4). As stated by the Fifth Circuit in *Khan*, "ISIS is an enemy of the United States. Supporting ISIS … is some evidence that [the defendant]'s conduct was calculated to influence or affect the conduct of the United

States because ISIS's terrorist acts are intended to intimidate or coerce the United States." *Id*. at 719.

That the defendant intended to influence or affect the conduct of governments is clear from other evidence presented at trial. Inmate 2 testified the defendant wanted to instill Sharia law in America and "everywhere that Muslims go." (Inmate 2 Tr. 9:8-12). The defendant was keenly aware of the international scope of ISIS's terrorist activities, as he celebrated attacks that occurred in Sweden and elsewhere, and told Inmate 2 how to travel internationally to join ISIS. (Inmate 2 Tr. 38:14-20). Furthermore, the manual the defendant distributed is an actual outline on how to conduct guerilla-type operations to defeat opposing military forces and topple existing regimes, including the United States. (Ex. C, p. 31). The manual specifically references the September 11, 2001 terrorist attack as an example of how to "shatter the image of the regime targeted by the attacks." (Ex. C, p. 33) ("Following the attacks on New York and Washington, America had its proverbial nose rubbed in the (illegible) humiliation."). The manual consistently lists Americans as priority targets, and directs that "priority would go to the citizen's [sp] of infidel countries who are directly involved in the support of the local apostates. For example, in the land of the two Holy Shrines [Saudi Arabia], the first elements to be targeted should be Americans, then the Britons. In Iraq, it should be the Americans. In Afghanistan, the Americans." (Ex. C, p. 32). The defendant's efforts to recruit and provide personnel prepared to carry out ISIS's lethal objectives squarely fit within the definition of an offense calculated to influence or affect the conduct of government by intimidation or coercion.

The defendant's conduct was also calculated to retaliate against the United States government. Inmate 1 testified the defendant had animosity toward the United States, as evidenced by his description of the Orlando night club shooting as "well-deserved." (Inmate 1

Tr. 8-9: 7-13, 2-22).  Inmate 2 testified the defendant said he would "have revenge on America," and talked about bringing a liquid bomb to Texas.  (Inmate 2 Tr. 91-92:20-4).  During a recorded conversation about Americans, the defendant told Inmate 2, "wherever you find it … kill them." (Exhibit E, 2:19-21 & 2:9-12) (admitted at trial as Exhibit 25E).  In the same conversation the defendant told Inmate 2, "they kill kids, we gonna kill kids."  (Ex. E, 4:1-3).  The defendant's interest in and willingness to seek revenge for perceived injuries is well established by the defendant's own description of the plan to bomb the New York detention facility in retaliation for his earlier prosecution.  It is reasonable to infer that part of the purpose of providing personnel to ISIS, particularly in view of his plan to have Inmate 1 remain in the United States to carry out ISIS's directives, was to strengthen an organization that is antithetical to the United States' national security interests and retaliate against the United States government.  The terrorism enhancement therefore applies to count 1.

  The adjusted offense level for the second count of conviction, making false material statements, is 14.  (PSR, ¶ 34).  Pursuant to U.S.S.G. § 3D1.4(c), the second count of conviction does not increase the applicable offense level, but may provide a reason for sentencing at the higher end of the sentencing range for the applicable offense level.  Accordingly, the total offense level here is 40.  (PSR, ¶ 38).  Based on a total offense level of 40 and a criminal history category of VI, the imprisonment range is from 360 months of imprisonment to life.  (PSR, ¶ 75).  However, as the applicable guideline range exceeds the statutorily authorized term of imprisonment, the guideline range in this case is 300 months.  (PSR, ¶ 75).

  Under U.S.S.G. § 5G1.2(d), when sentencing on multiple counts of conviction, if the sentence imposed on the count carrying the highest statutory maximum is less than the total punishment, then the sentence imposed on one or more of the other counts shall run

consecutively, but only to the extent necessary to produce a combined sentence equal to the total punishment. *See also United States v. Gonzales*, No. 07-10669, 2008 WL 681514 * 1 (5th Cir. March 11, 2008) (finding district court may impose consecutive sentences to achieve an aggregated sentence within the applicable guideline range). A sentence within a properly calculated guidelines range is presumptively reasonable. *United States v. Alonzo*, 435 F.3d 551, 554 (5th Cir. 2006).

## IV. Defendant Objections

The defendant has lodged an objection to the PSR "in its entirety due to gross inaccuracies and disinformation/misinformation." (ECF Doc. No. 190 ¶ 2). A PSR, however, generally bears sufficient indicia of reliability to be considered as evidence by the sentencing judge in making factual determinations. *See United States v. Harris*, 702 F.3d 226, 230 (5th Cir. 2012). A district court may adopt the facts contained in a PSR without further inquiry if those facts have an adequate evidentiary basis with sufficient indicia of reliability and the defendant does not present rebuttal evidence or otherwise demonstrate that the information in the PSR is unreliable. *See Id.* "Mere objections to such supported facts are generally insufficient." *Id.*

Here, the defendant offers allegations that are insufficient to rebut or undermine the information in the PSR. The defendant claims the government's witnesses had a vested interest in lying "in the hope of receiving a time reduction of their prison sentence," and "it is a known fact the CI's did in fact receive a substantial time reduction." (ECF Doc. No. 190 ¶¶ 6, 7). Inmate 1, however, had finished a 14-year sentence by the time of trial and did not receive a sentencing reduction. (Inmate 1 Tr. 4:2-6 & 46:2-3). Inmate 2 testified he believed he received a 3 or 4 week reduction from a 7 or 8 year sentence. (Inmate 2 Tr. 98:12-23). [2] The defendant

---

[2] The government estimates Inmate 2 received a 3 month reduction. (Inmate 2 Tr. 98:11-14).

11

also says he is a "pauper" and it is "laughable that witnesses testified [the defendant] promised to give millions of dollars to so-called 'recruits.'"  (ECF Doc. No. 190 ¶¶ 14-16).  The testimony at trial, however, was that the defendant would connect the inmates with a group that could provide resources, and substantial evidence in fact links the defendant to a terrorism-facilitation group in Sweden.

The defendant's other objections are not relevant to the reliability of the PSR and are simply inaccurate.  For example the defendant alleges that he was kidnapped from Nigeria (ECF Doc. No. 190 ¶¶ 8, 17), when in fact he was arrested pursuant to a valid warrant issued from the Southern District of New York, and later pled guilty in that very case.  (See Ex. A, 22:16-22).  The defendant also claims the Court lacks subject matter jurisdiction over him, but subject matter jurisdiction over all federal criminal prosecutions is conferred on district courts by 18 U.S.C. § 3231.

The defendant's unsupported assertions that the PSR is inaccurate are insufficient to warrant wholesale disregard of the report.  *See Harris,* 702 F.3d at 230.  The defendant's one substantive objection, that count 3 carries a maximum sentence of 5 years rather than 8, has been addressed in the final PSR.  (ECF Doc. No. 190 ¶ 18).  The defendant has failed to offer sufficient countervailing evidence to rebut the factual information in the Pre-Sentence Report and has not contested the Guidelines calculation, therefore the Court may rely upon the PSR.

## V. Analysis

Title 18 U.S.C. § 3553(a) sets out factors the Court should consider when determining the appropriate sentence.  "As a matter of administration and to secure nationwide consistency, the Sentencing Guidelines should be the starting point and the initial benchmark" for determining the defendant's sentence.  *Gall v. United States*, 522 U.S. 38, 49 (2007).  The Supreme Court has

recognized that the Sentencing Commission's recommendation of a sentencing range "will reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Kimbrough v. United States,* 552 U.S. 85, 90 (2007) (citations omitted).

Application of the § 3553 factors in combination with the Guideline calculations, *supra*, demonstrates in this case a guideline sentence is "sufficient, but not greater than necessary" to comply with § 3553(a).  A trial judge has wide discretion in determining what sentence to impose.  *United States v. Tucker*, 404 U.S. 443, 446 (1972).  It is within the court's discretion to impose the sentence for count 3 consecutively to count 1.  *See Sutton v. United States*, 266 F.2d 529, 529 (5th Cir. 1959) (upholding sentences for conspiracy and substantive counts imposed consecutively).  A sentence within the statutory maximum will generally not be disturbed on appeal.  *See United States v. Jackson*, 696 F.2d 320, 321 (5th Cir. 1978) (upholding sentence of two five-year prison terms imposed consecutively).

> A. **The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant**

The defendant stands convicted of attempting to provide material support or resources to ISIS in violation of 18 U.S.C. § 2339B.  When Congress enacted § 2339B in 1996, it made the specific finding that "foreign organizations that engage in terrorist activity are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct." *Humanitarian Law Project,* 561 U.S. at 29.  Providing foreign terrorist groups with material support in any form also furthers terrorism by straining the United States' relationships with its allies and undermining cooperative efforts between nations to prevent terrorist attacks.  *Id.* at 31.

In a report on international terrorism in 2016, the Department of State declared ISIS the most potent terrorist threat to global security, with 8 recognized branches and numerous undeclared networks operating beyond the group's core.  *See* Dep't of State, Bureau of

Counterterrorism, *Country Reports on Terrorism 2016 : Chapter 1, Strategic Assessment* (July 2017).  In 2014, ISIS was responsible for the deaths of thousands of Iraqi civilians.  *Id.* at *Chapter 6, Terrorist Organizations*.  ISIS conducted several large-scale attacks across the globe in 2015 and 2016, including a suicide attack at a football match in Iraq that killed approximately 29 people, the coordinated attacks in Paris that killed approximately 130 people, and the coordinated attacks in Belgium that killed approximately 32 people.  *Id.*  ISIS claimed responsibility for the cargo truck attack in Nice that resulted in 86 deaths, and the truck attack at a Christmas market in Berlin that killed 12 people.  *Id.*  The defendant demonstrated he was not only attuned to atrocities committed by ISIS, but also he celebrated those acts and sought to facilitate ISIS's capacity to continue engaging in terrorism by providing soldiers who were mentally and physically prepared to carry out ISIS's directives.

      The defendant also stands convicted of lying to the FBI.  Despite the detailed description the defendant gave of an explosive utilizing RDX he wanted to deploy in New York and the testimony of Person A about the explosives training in Khalden, the defendant claimed to have no knowledge of bomb-related chemicals.  The defendant attempted to thwart the FBI's investigation into a plot that endangered the lives of United States citizens by making false statements that obscured his own knowledge and capability to carry out the revenge plot.

      The defendant's history of committing serious offenses began almost three decades ago.  In 1994, the defendant was convicted of robbery in Sweden.  (PSR, ¶ 49).  In 2003, in Stuttgart, Germany, the defendant was convicted of credit card fraud.  (PSR, ¶ 49).  That same year, in Tubingen, Germany, the defendant was convicted of using false documents and fraud.  (PSR, ¶ 49).  The defendant did not receive any criminal history points for these convictions due to the age of the offenses.  *See* U.S.S.G. § 4A1.2(e)(3).  A few years after being convicted of various

types of fraud in Germany, the defendant left Sweden and traveled to Africa, where he was eventually apprehended in 2009. The defendant was brought to the United States in 2010, and pled guilty to conspiring to provide material support and conspiring to receive military-type training in 2012.

Despite acknowledging the elements of 18 U.S.C. § 2339B in a United States court, and receiving a punishment of 111 months, the defendant proceeded to attempt to provide material support to ISIS by recruiting and training inmates at Beaumont FCI, the very crime for which he had been imprisoned. The defendant's commitment to terrorism is long-standing and deeply entrenched. The nature and circumstances of the offense and the history and characteristics of the defendant weigh in favor of a Guidelines sentence of 300 months.

**B.      Adequate Deterrence & Protection of the Public from Future Crimes**

The need for a sentence that affords adequate deterrence and protection to the public is strong in terrorism cases. "[T]he Guidelines, while only advisory, appropriately reflect Congress's considered judgment that terrorism is different from other crimes. Terrorism represents a particularly grave threat because of the dangerousness of the crime and the difficulty of deterring and rehabilitating the criminal." *United States v. Mumuni Saleh*, No. 18-1604-CR, 2019 WL 7196814, at *11 (2d Cir. Dec. 27, 2019) (quotations omitted). The sentence should be sufficiently serious to "deter like-minded sympathizers from taking even the first step toward transforming sympathy into action." *United States v. Rayyan*, 885 F.3d 436, 440-41, 443 (6th Cir. 2018) (upholding upward variance in sentencing ISIS sympathizer on unlawful possession of a firearm and marijuana).

In addition to providing general deterrence, there is a need here to protect the public from future crimes by this defendant. The defendant's determination to seek recruits for a brutal

terrorist organization despite being punished for previously providing material support, and willingness to lie to law enforcement about his activities, demonstrate the defendant's incorrigible commitment to facilitate and support terrorist organizations and activity. The defendant demonstrates no remorse for his conduct and no understanding of the threat to national security his offenses pose. Rather, the defendant casts himself as a "victim" and demeans the very process afforded him by United States law. (ECF Doc. No. 190 ¶¶ 3, 11, 17) (referring to trial as a "kangaroo court"). Where the defendant has previously been convicted of the same conduct and has given no indication that he will desist from providing material support to terrorist organizations in the future, the § 3553(a) factors weigh in favor of a Guidelines sentence.

**C.      Supervised Release**

The § 3553(a) factors analysis, *supra*, also weighs in favor of imposing a life term of supervised release. The Court should give particular consideration to the defendant's criminal history in determining whether to impose supervised release. *See* U.S.S.G. § 5D1.1 cmt. n. 3(B). "In general, the more serious the defendant's criminal history, the greater the need for supervised release." *Id*. Here, the defendant's long-standing history of engaging in serious crime and repeated efforts to facilitate terrorism warrant a lengthy prison sentence coupled with the added protection of supervised release. *See Wright*, 747 F.3d at 416 (upholding imposition of lifetime term of supervised release where sentencing court noted "concern as to the future actions of the defendant once he has served his sentence.").

The term of supervised release may be up to life, if the offense of conviction is listed in 18 U.S.C. § 2332b(g)(5)(B), and the commission of the offense resulted in, or created a foreseeable risk, of death or serious bodily injury. U.S.S.G. § 5D1.2(b)(1). As discussed above,

providing material support to a foreign terrorist organization is an offense enumerated in 18 U.S.C. § 2332b(g)(5)(B)(i). In this case, the defendant attempted to recruit inmates to join ISIS as soldiers, and instructed Inmate 2 to "kill the kufr, the nonbelievers, with a knife, with a gun, with whatever instrument you can put your hands on." (Inmate 2 Tr. 24:12-15). The defendant's effort to provide trained fighters to a brutal terrorist organization created a foreseeable risk of causing death or serious bodily injury to other persons, therefore U.S.S.G. § 5D1.2(b)(1) applies. *See United States v. Tounisi*, 900 F.3d 982, 989 (7th Cir. 2018) (upholding imposition of statutory maximum term of incarceration and lifetime supervised release where defendant attempted to join Jabhat al-Nusra).

The government recognizes courts are ordinarily discouraged from imposing a term of supervised release in cases in which supervised release is not required by statute and the defendant is a deportable alien who will likely be deported after imprisonment. U.S.S.G. § 5D1.1(c). However, Application Note 5 to U.S.S.G. § 5D1.1(c) clarifies that the court should consider imposing supervised release if the court determines it would provide an added measure of deterrence and protection based on the facts and circumstances of a particular case. In addition to the other considerations addressed above, uncertainties about the ability of the United States to deport the defendant to Eritrea, his country of origin, render this just such a case.[3]

Eritrea has historically been uncooperative with accepting deportable defendants. In 2016, Eritrea was listed as an uncooperative country by the Department of Immigration and Customs Enforcement, meaning Eritrea refused to take citizens who had been ordered deported from the United States after being convicted of felonies. Carol Morello, *Deporting convicted criminals from the U.S. is not as easy as it sounds*, Washington Post, November 28, 2016. In

---

[3] The defendant previously had permanent resident status in Sweden. In 2015, the Swedish Migration Agency decided to revoke the defendant's status and the defendant is not deportable to Sweden.

2017, about 700 Eritrean nationals in the United States were subject to final orders of removal, but Eritrean officials refused to cooperate with their deportations.  Ron Nixon, *Trump Administration Punishes Countries That Refuse to Take Back Deported Citizens*, New York Times, September 13, 2017.  The ability of the United States to deport the defendant to Eritrea at the end of his term of incarceration is not certain, and the defendant will remain in the United States if he is not deported.  In order to provide demonstrably needed protection to the public from future crimes of the defendant, a term of lifetime supervision should be imposed to provide adequate tools to monitor the defendant and prevent future illegal activity.

## CONCLUSION

Based on the foregoing, the Government in this case requests that this Court impose a sentence within the Guidelines Provisions custody range of 300 months and a lifetime term of supervised release.

    Respectfully Submitted,

    JOSEPH D. BROWN
    UNITED STATES ATTORNEY
    Eastern District of Texas

By: _____
    CHRISTOPHER RAPP
    Assistant United States Attorney
    Eastern District of Texas

By: _____
    ALICIA H COOK
    STEPHANIE SWEETEN
    Trial Attorneys
    Counterterrorism Section
    National Security Division
    Department of Justice

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing was sent to the defendant.

*/s/* ALICIA H COOK
